## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------- x
JANE PASCALE KITE                :
                                 :
          Plaintiff,             :   Civil No. 3:07-cv-0513(AWT)
                                 :
v.                               :
                                 :
JOHN PASCALE, JR. and PASCALE-   :
BURGER RENTALS INC.,             :
                                 :
          Defendant.             :
------------------------------- x
```

### MEMORANDUM OPINION

For the reasons set forth below, after a bench trial, the court finds for the plaintiff on three of her claims against defendant John Pascale, Jr., namely the claims for breach of fiduciary duty as executor of an estate, for unjust enrichment and for conversion.

## I.    BACKGROUND

Plaintiff Jane Pascale Kite and defendant John Pascale, Jr. are two of the three children of the late Madeline Pascale and the late John Pascale, Sr.  John Pascale, Jr. is the president of defendant Pascale-Burger Rentals Inc.  A few years prior to his death, John Pascale, Sr. executed a durable power of attorney naming John Pascale, Jr. as his attorney-in-fact.  In his Last Will and Testament, dated March 6, 1999, John Pascale, Sr. named his three children as beneficiaries and the defendant,

John Pascale, Jr. as his personal representative to administer his estate.

Plaintiff Jane Pascale Kite brings the following claims against the defendants: in Count One, a claim against John Pascale, Jr. for breach of fiduciary duties, under three theories; in Count Two, a claim against John Pascale, Jr. for tortious interference with the plaintiff's inheritance; in Count Three, a claim against Pascale-Burger Rentals Inc. for tortious interference with the plaintiff's inheritance; in Count Four, a claim for unjust enrichment against John Pascale, Jr.; in Count Five, a claim for unjust enrichment against Pascale-Burger Rentals Inc.; in Count Six, a common law claim for conversion against John Pascale, Jr.; and in Count Seven, a claim for statutory theft in violation of Connecticut General Statutes § 52-564 against John Pascale, Jr.

## II.  FACTS

John Pascale, Sr. ("Senior") and his wife Madeline Pascale retired to Florida in 1974. They lived in Florida at the time of Madeline's death in 1994.  Thereafter, Senior continued to live in their Florida home.

The plaintiff, Jane Pascale Kite ("Jane"), is the eldest child of Madeline Pascale and Senior.  She lives in Clarence, New York with her husband, Joseph Kite.  She is a retired physician and he is a retired university professor.  Judith

Pascale Judd ("Judith"), the middle child, is a resident of Clinton, Connecticut.  Defendant John Pascale, Jr. ("Junior") is the youngest of the three children.  He is also a resident of Clinton, Connecticut.

Junior is the president and a 50% (at one point 51%) shareholder of defendant Pascale-Burger Rentals Inc. ("PBR"), which is a Connecticut corporation with its principal place of business in Madison, Connecticut. The other shareholder of PBR is Douglas Burger, who is also the ex-husband of Junior's daughter.

In 1990, Senior developed a kidney infection, and Junior spent time in Florida helping care for him.  Jane did not go to see him at that time.

In 1991, Madeline Pascale and Senior conveyed to each of the three children separate parcels of real property located in High Springs, Florida.  They conveyed about 105 acres of land and a house to Jane, about 81 acres to Judith, and about 81 acres and a building to Junior.

In 1996, PBR purchased a gas station in Madison, Connecticut from Adrian Bassett.  In connection with the purchase, Bassett made a loan to PBR for a portion of the purchase price (the "Bassett Loan").

For years prior to 1998, Senior owned stock in a good number of companies.  At Christmastime in 1998, Senior told Jane

that he would be selling some of his stock and use the proceeds
to buy certificates of deposit.  Senior told Junior that he
would be converting his stock holdings to certificates of
deposit, and Junior was under the impression that Senior owned
no stock by mid-2000.  In fact, Senior continued to own stock in
two companies up until the time he died; he owned stock in
McMoRan Exploration and penny stock in New Oro Peru Resources.
As of September 2009, the 200 shares of stock in New Oro Peru
Resources were worth $96.12 and the 140 shares of stock in
McMoRan Exploration were worth $1,073.80.  Junior did not become
aware of these holdings until he was advised about them by the
plaintiff's counsel during the course of this litigation.  Even
though Junior had received notices with respect to the New Oro
Peru stock, he had discarded them.  Other than the stock in
those two companies, the stock held by Senior was sold and the
proceeds apparently used to purchase certificates of deposit;
although the plaintiff had a financial expert who discussed
Senior's stockholdings, that expert was instructed to assume
that Senior continued to have significant holdings after 1995.

Senior had a coin collection.  One part of Senior's coin
collection was coins from Franklin Mint, which Senior's late
wife had collected.  Another part of his coin collection was
silver and gold that he purchased from Investment Rarities.
When Jane saw Senior at Christmastime in 1998, Senior told her

-4-

that he was going to give Junior some of the coins in the coin collection, and that Junior was going to put them in a display cabinet at his gas station and sell them.

Around the same time, Senior gave Jane more than 100 coins. Jane was under the impression that Senior was short of money based on what Senior had told her, and Jane offered to buy the coins from Senior.  Jane sent Senior $200 per month for three or four months, after which Senior told her that he did not need the money.

After Senior gave him coins, Junior sold some on the online auction site eBay in 1999, but held off on selling them all because the market price was going up.  He did not finish selling them until 2002.  Junior understood that the coins were being given to him so that he could use the proceeds from selling them to pay off the balance of the Basset Loan. Although Junior understood the coins to be a gift, he gave one-half of the proceeds of each sale to Senior.  Junior and Senior discussed the sale of the coins from time to time.  Junior stopped sending Senior checks for half of the proceeds of each sale after Senior told him that he should stop sending checks to him and apply all of the proceeds to the Bassett Loan; that was similar to his conduct with respect to the coins he gave Jane. Junior completed the process of selling the coins in 2002. Although he had been selling the coins from 1999 to 2002, he

reported all the sales on his 2002 tax return.  Senior was listed as a dependent on that tax return, and the total sales price reported was $160,300.

By early 2000, Junior and Senior decided that Senior would come to live with Junior in his home in Connecticut.  Junior brought Senior to Connecticut in early 2000 to get things ready for Senior's relocation.  Senior had a talk with his granddaughter (Junior's daughter) about appointing Junior as his attorney-in-fact.  She dealt only with Senior concerning preparation of the power of attorney; she was not contacted at all by Junior concerning the proposed power of attorney.

On March 28, 2000, Senior executed the power of attorney, appointing Junior as his attorney-in-fact.  Although the power of attorney contains broad powers, such as the authority to act on Senior's behalf with regard to real estate transactions; chattel and goods transactions; bond, share and commodity transactions; and estate transactions, Junior only used the power of attorney on two occasions.  One was in connection with Senior's admission to Watrous Nursing Center, a nursing facility in Madison, Connecticut, and the other was when Senior was admitted to Strong House Adult Day Center, an adult day care center in Madison, Connecticut.  There is no evidence that Junior used the power of attorney on any other occasion, and no

evidence that he ever used the power of attorney for personal gain.

In April 2000, Senior returned to Florida.  On April 4, 2000, while Junior was in Connecticut, Senior modified his bank accounts to make them jointly held with Junior.  Junior believed that they had been modified to be jointly held with rights of survivorship.  Once Junior was an authorized signatory on the bank accounts, they both wrote checks on the checking account; Senior used the checks with low numbers and Senior used the checks with high numbers.

In July 2000, Senior suffered a gunshot wound.  Junior traveled to Florida to see Senior; Jane did not.  In August 2000, Junior helped Senior relocate from Florida to Junior's home in Connecticut.  Junior was Senior's primary caretaker, and a devoted one.  Judith was responsible for Senior when Junior had to work on weekends.  Senior referred to Junior as his "best friend."  Among other things, Junior paid Senior's bills, prepared his income tax returns and executed health care and related documents on his behalf.  Junior paid Senior's expenses out of Senior's bank accounts.

In December 2001, Junior used approximately $56,000 of the funds in the bank accounts to purchase an annuity from Fidelity and Guaranty Life Insurance Company (the "F&G Annuity").  In February 2007, after Senior's death, Junior received $56,964.69

on account of the F&G Annuity, which he deposited into his own bank account.  Subsequently, Junior received a check from Fidelity and Guaranty Life Insurance Company for $56,964.69, which represented the full surrender value of the F&G Annuity. Junior deposited this in his personal bank account.

As discussed above, by 2002 Junior had sold most of the coins that had been given to him by his father, and he used the proceeds to pay off the balance of the Bassett Loan.  At that point, because Junior had paid off the balance of the Bassett Loan for PBR, if he wanted evidence of PBR's indebtedness to him, he should have had PBR issue a promissory note payable to him.  He did not do that, however.  Junior wanted Senior to be able to get the money owed to Junior by PBR in the event anything happened to Junior.  Therefore, he had BBR issue a $123,471.78 principal amount Commercial Promissory Note dated August 1, 2002 to Senior.  The Commercial Promissory Note was secured by a mortgage on the premises out of which PBR operated its business, and a conditional assignment of rentals.  In addition, Junior entered into a subordination agreement whereby a mortgage held by Junior on the premises was subordinated to the mortgage securing the Commercial Promissory Note.  The documents were prepared by Junior's daughter, who had little to no experience with such transactions.

The terms of the Commercial Promissory Note and the related documents are clear and unambiguous and they created an obligation on the part of PBR to Senior regardless of Junior's intent or Senior's intent at the time the Commercial Promissory Note was issued and the related documents were executed.

There was skepticism on the part of plaintiff's counsel and also on the part of the court when Junior testified about what led to the issuance of the Commercial Promissory Note. Junior testified in part as follows:

> [JUNIOR]:   Because that was real money that I paid for. I bought that mortgage out with money from the coin sales and I wanted to get the money back. So I wasn't going to forgive the note until the money was all paid back.
>
> [PLAINTIFF'S COUNSEL]:   I don't understand your testimony, sir. The note ran from Pascale-Burger Rentals to your father, correct?
>
> [DEFENDANTS' COUNSEL]:   Objection.
>
> THE COURT:   I don't understand it either, so I guess I'd like to have it explained.
>
> [DEFENDANTS' COUNSEL]:   No problem, simply clarify.
>
> [JUNIOR]:   I paid $123,000 to Adrian Bassett to buy his note up. At the time when the note was forgiven in 2004, only a portion of it was really paid. So they still owed me money against the $123,000.
>
> [PLAINTIFF'S COUNSEL]:   Who is "they"?
>
> [JUNIOR]:   The company.
>
> [PLAINTIFF'S COUNSEL]:   Your company?
>
> [JUNIOR]:   Yes.

    [PLAINTIFF'S COUNSEL]:   That you're the president of?

    [JUNIOR]:   That's correct.

(Tr. Vol. I at 135-36.)  The court viewed this and related testimony by Junior with a good deal of skepticism, but ultimately found it credible.  The result is that Junior caused PBR to enter into a transaction with respect to the Commercial Promissory Note that was a valid and binding transaction, but he was not well-advised as to the legal consequences of the transaction.

    Although it was not noticeable to many who interacted with Senior, Senior began to experience symptoms of dementia by mid-summer 2003.  On two occasions he was found wandering and had to be returned to Junior's home.

    In November 2003, Senior celebrated his 100th birthday, and his children in Connecticut organized a birthday party for him. Jane did not attend.  She offered a number of reasons why she did not during her deposition and at trial, including that she was only given two weeks' notice and that was too short, that it would have been too expensive for her and her husband because they would have had to put their dogs in a kennel and would have had to fly to Connecticut, that she did not have a way to get from the airport in Hartford out to Clinton and nobody offered to pick her up, that she would have had to make a hotel reservation, that her husband had some other commitments and she

did not want to drive because the roads are very icy in November, and that she had just seen her father a couple of months earlier. Though this was far from the most important topic covered during the trial, this part of Jane's testimony was illustrative of two things. First, her testimony together with the testimony of others who were knowledgeable about her dealings with other members of the family make it clear that Junior was very devoted to Senior and contributed extensively in terms of supporting and caring for Senior, while Jane was the opposite. Second, Jane was simply not credible and how she responded to this line of questioning contributed to damaging her credibility. Considering this fact in combination with the fact that many of the significant parts of Jane's testimony with respect to more important topics initially seemed to be presented as based on her personal knowledge but in fact were not based on personal knowledge and were not true, the court concluded that her testimony had to be evaluated very carefully. Junior's testimony had to be evaluated carefully, but in his case the court concluded that inconsistencies in his testimony were due to difficulty of recollection and difficulty focusing because he was recovering from an injury, whereas in the case of Jane's testimony, the court's concern was being intentionally misled.

On February 2, 2004, Senior endorsed the Commercial Promissory Note, indicating that it had been paid in full. Junior testified that Senior wrote his signature in his own handwriting and that he handed the original to Junior, with "paid in full" written on it and with Senior's signature on it. The plaintiff contends that Junior forged Senior's signature. The plaintiff engaged John L. Sang, an expert in the field of document forensic examination, to examine the authenticity of the "John Pascale, SR" signature on the February 2, 2004 statement on the Commercial Promissory Note that it had been paid in full (the "Questioned Signature").  Sang compared the Questioned Signature to examples of Senior's and Junior's signatures, which were provided to Sang by the plaintiff's counsel.  In Sang's opinion, the Questioned Signature was "probably not" written by Senior, and "there are indications" that the Questioned Signature was written by Junior.  (John L. Sang, Report Forensic Document Analysis, Ex. 23 at 6-7.)

After considering Sang's report and testimony, and looking at blowups of the signatures, the court is not persuaded by Sang's analysis and, moreover, finds Junior's testimony about the execution of the release persuasive.  Sang states in his report that he has "reservation[s]" about his opinions regarding the Questioned Signature because he analyzed copies, not originals, of the Questioned Signature and most of the

signatures of Senior and Junior to which he compared the
Questioned Signature.  (Id. at 6, 7.)  Sang testified that the
copying process causes a 25% loss of the data found in the
original signature.  Sang testified that, among other concerns
that flow from relying on copied signatures, he could not
determine where certain signature strokes started and stopped.
In addition, Senior's signature exhibited substantial variation,
especially later in his life, when it deteriorated materially --
and that is the point in time when the statement on the
Commercial Promissory Note was signed.  Although Sang testified
that such differences could be explained by natural variations
in Senior's handwriting, the plaintiff has not shown that the
differences between the Questioned Signature and the undisputed
signatures are the result of anything other than natural
variation, much less that it was Junior who wrote the Questioned
Signature.

In 2004, Senior's condition deteriorated.  By October he
was at Watrous Nursing Center and he was obviously in a weakened
condition.  Jane visited him there in October 2004, and she was
planning to see again him again in April.  The following month,
she and her husband went on a National Geographic Expeditions
tour to Antarctica, not having informed any of the family in
Connecticut that they were leaving or where they were going.
Thus, Jane could not be reached when Senior died on November 12,

2004, and she missed the funeral.  This appears to have
exacerbated tensions between her and Junior.  Junior paid all of
the funeral expenses.

Junior gave $30,000 to Judith following Senior's death.  He
gave nothing to Jane.

On October 21, 2005, Junior filed a Form S-2, succession
tax return, with the probate court; the Form S-2 was also signed
by an attorney who certified that the contents were true to the
best of his knowledge and belief.  The Form S-2 reported that,
at his death, Senior did not own or have an interest in any
property owned jointly with a right of survivorship, including
bank accounts.  It identified as jointly owned property bank
accounts having a total value of $166,513.00, and reported that
one half of that amount, $83,256.50, was property of the estate.
Consequently, the court finds that the bank accounts were
jointly owned without rights of survivorship.

## III. DISCUSSION

### A.   Parol Evidence Rule

The parol evidence rule "prohibits the introduction of
evidence that varies or contradicts an exclusive written
agreement whether or not there is an objection."  Ruscito v. F-
Dyne Electronics Co., Inc., 411 A.2d 1371, 1377 (Conn. 1979).
The parol evidence rule

-14-

"is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme."

HLO Land Ownership Assocs. Ltd. Partnership v. Hartford, 727 A.2d 1260, 1265 (Conn. 1999) (quoting Heyman Assocs. No. 1 v. Ins. Co. of Pennsylvania, 653 A.2d 122, 135 (Conn. 1995)).

Therefore, not all parol evidence is inadmissible, only that evidence "offered solely to vary or contradict the written terms of an integrated contract . . . ."  Id.  In other words,

such evidence may still be admissible if relevant "(1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud." Jay Realty, Inc. v. Ahearn Development Corporation, 189 Conn. 52, 56, 453 A.2d 771 (1983). These recognized "exceptions" are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that "relief can be had against any deed or contract in writing founded in mistake or fraud." Noble v. Comstock, 3 Conn. 295, 299 (1820).

Heyman, 653 A.2d at 135.

The Commercial Promissory Note does not contain any recitals giving the background of an underlying transaction. It merely states that PBR promises to pay to the order of Senior $123,471.78 together with interest, and promises to do so for value received. Nor do any of the related loan documents contain any recitals giving the background of an underlying transaction; they merely reflect that they are entered into for the purpose of securing PBR's obligations under the Commercial Promissory Note.

At trial, there was objection to certain evidence offered by the defendants with respect to what Junior was attempting to accomplish by having PBR issue the Commercial Promissory Note. To the extent that such evidence is not used to vary or contradict the written terms of the Commercial Promissory Note and the related loan documents, it is not inadmissible pursuant to the parol evidence rule.

Thus, regardless of what Junior was attempting to accomplish by having PBR issue the Commercial Promissory Note, PBR owed the principal amount of $123,471.78 plus interest to Senior pursuant to the Commercial Promissory Note. However, what Junior was attempting to accomplish by having the Commercial Promissory Note issued is relevant to issues in this case other than whether PBR owed such an amount to Senior under the Commercial Promissory Note. Therefore, as reflected in the

discussion below, such evidence has been considered by the court for such other purposes.

**B.    Breach of Fiduciary Duty (Count One)**

The plaintiff claims that Junior breached fiduciary duties he owed: (i) as a fiduciary to Senior during his lifetime; (ii) as a fiduciary to Senior's estate and the beneficiaries thereof; and (iii) as the attorney-in-fact for Senior.  Claims (i) and (ii) are based on the contention that Junior breached fiduciary duties under Connecticut common law, whereas claim (iii) is based on the contention that he breached a fiduciary duty in his role as a professional fiduciary.

With respect to the common law breach of fiduciary duty claims,

> [t]he essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut law are: (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the **defendant** to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any manner relating to the plaintiff; (2) That the defendant advanced his or her own interests to the detriment of the plaintiff; (3) That the plaintiff has sustained damages; and (4) That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty.

Banning v. Right Choice Real Estate, LLC, No. CV106003818S, 2011 WL 1033223, at *4 (Conn. Super. Ct. Feb. 22, 2011) (quoting T. Merritt, 16 Conn. Prac. Series: Elements of an Action (2010-2011

Ed.) §8:1, p. 534); see also Coppola Constr. Co., Inc. v.
Hoffman, No. HHDCV 106016911S, 2012 WL 6634681, at *3 n.11
(Conn. Super. Ct. Nov. 26, 2012).  Thus, the court must first
determine whether a fiduciary relationship existed, and then, if
so, whether that duty was breached to the injury of Senior or
Senior's estate, and to the benefit of Junior.

        The Connecticut Supreme Court "has chosen to maintain an
imprecise definition of what constitutes a fiduciary
relationship in order to ensure that the concept remains
adaptable to new situations." Ahern v. Kappalumakkel, 903 A.2d
266, 270 (Conn. App. 2006).  Rather than provide a specific
definition, the Supreme Court has "cho[sen] instead to leave
'the bars down for situations in which there is a justifiable
trust confided on one side and a resulting superiority and
influence on the other.'" Alaimo v. Royer, 448 A.2d 207, 209
(Conn. 1982) (quoting Harper v. Adametz, 113 A.2d 136, 139
(Conn. 1955)).  However, the Supreme Court has provided a broad
description of fiduciary relationships as being "characterized
by a unique degree of trust and confidence between the parties,
one of whom has superior knowledge, skill or expertise and is
under a duty to represent the interests of the other." Dunham
v. Dunham, 528 A.2d 1123, 1133 (Conn. 1987) overruled in part on
other grounds by Santopietro v. New Haven, 682 A.2d 106 (Conn.
1996).  Therefore, the determination of whether a common law

fiduciary relationship existed depends on the specific facts with respect to the interactions between Junior and Senior.

Also, the Connecticut Supreme Court has held that an estate executor's "primary duty is to the estate itself, and to fulfilling the intentions of the decedent with respect to the estate", thereby creating a fiduciary relationship between the executor and the estate. Cadle Co. v. D'Addario, 844 A.2d 836, 850 (Conn. 2004); see also Finnegan v. La Fontaine, 191 A. 337, 339 ("In [Connecticut] we regard an executor or administrator as a fiduciary representing the rights of the heirs and distributes and also those of creditors."). Thus, because Junior was the executor of his father's estate, he was in a fiduciary relationship with the beneficiaries of that estate.

With respect to breach of fiduciary duty, it is well established that "[o]nce 'a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . .'" Dunham at 1134 (quoting Alaimo, 448 A.2d at 209). "Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." Id. While the types of actions that may constitute a breach of this duty are also not clearly defined, the Connecticut Supreme Court has stated that the

"breach of a fiduciary duty implicates a duty of loyalty and honesty." <u>Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin</u>, 717 A.2d 724, 730 (Conn. 1998).

However, with respect to damages, there is no burden shifting.  <u>See, e.g.</u>, <u>Thomas v. Biller Assocs. Tri-State, LLC</u>, No. CV054010695S, 2011 WL 4507207, at *7 (Conn. Super. Ct. Aug. 31, 2011).  Therefore, the plaintiff maintains the burden of demonstrating the amount of damages suffered and that such damages were proximately caused by Junior's actions.

In terms of the duties Junior owed to Senior as a result of his designation as attorney-in-fact, the Connecticut Supreme Court has held that "the power of attorney . . . . [is] a written, formal contract of agency creating a principal-agent relationship", and that one aspect of this "is the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." <u>Long v. Schull</u>, 439 A.2d 975, 977 (Conn. 1981).  Therefore, by acting as his attorney-in-fact, Junior was in a fiduciary relationship with Senior.  However, with respect to such a relationship, it is important to note that

> "[a]lthough an attorney-client relationship imposes a
> fiduciary duty on the attorney . . . not every
> instance of professional negligence results in a
> breach of that fiduciary duty. [A] fiduciary or
> confidential relationship is characterized by a unique

degree of trust and confidence between the parties,
one of whom has superior knowledge, skill or expertise
and is under a duty to represent the interests of the
other ... Professional negligence implicates a duty of
care, while breach of a fiduciary duty implicates a
duty of loyalty and honesty." (Citations omitted;
internal quotation marks omitted.)

Straw Pond Assocs., LLC v. Fitzpatrick, Mariano & Santos, P.C.,

No. FSTCV116010036S, 2012 WL 1871487, at *2 (quoting Beverly

Hills Concepts, 717 A.2d at 730).  Thus, mere negligence by

Junior in acting as Senior's attorney-in-fact will not suffice.

The plaintiff seeks damages based on the value of six

categories of assets.  With respect to three of those

categories, the court concludes that the defendants have no

liability to the plaintiff based on breach of fiduciary duty.

First, the defendants have no liability with respect to the

Commercial Promissory Note because all obligations to Senior

under the Note were forgiven by him on February 2, 2004.

Second, as to the coin collection, the sale of which was

completed in 2002, the defendants have no liability to the

plaintiff because that sale was undertaken by agreement between

Senior and Junior, and to the extent that Junior received

proceeds from the sale of the coins they were used to pay the

Bassett Note, so the funds that are at issue are in substance

the same funds that are at issue with respect to the Commercial

Promissory Note.  Thus, any obligation based on those funds was

forgiven by Senior on February 2, 2004.

Third, with respect to the shares of stock owned by Senior, all shares other than those in New Oro Peru Resources and McMoRan Exploration were sold by Senior prior to his move to Connecticut.  The plaintiff has not established that Junior had sufficient knowledge with respect to these remaining two stockholdings to be the proximate cause of any damages to the plaintiff by breaching some duty, as opposed to merely having been negligent.

The remaining three categories of assets are the Bank of America ("BOA") joint checking account, the BOA certificate of deposit accounts and the F&G Annuity.  With respect to each category of asset, the plaintiff has determined a value for the asset, which should be included in Senior's estate, and she seeks one-third of that value as damages based on the terms of Senior's Last Will and Testament.

With respect to the BOA checking account, the plaintiff seeks to have included in the estate an amount in the range of $971 to $1,100.  Based on the analysis below, some amount should be included in the estate.  The court is not certain looking at Plaintiff's Exhibit 24 exactly what those numbers are based on, but concludes that at least $1,100 should be included in the estate.  Thus, the plaintiff's one-third interest is $366.66.

With respect to the BOA certificate of deposit accounts, based on the Form S-2 succession tax return, $83,256.50 should

have been included in the estate, and the plaintiff's one-third interest is $27,752.16.

With respect to the F&G Annuity, the evidence shows that it was purchased in December 2001.  The evidence is conflicting as to whether interest accumulated in the annuity or was paid out and used by Junior to cover Senior's expenses.  The proceeds of the annuity were received by Junior in February 2007.  Based on the analysis below, $56,964.69 should have been included in the estate.  Thus, the plaintiff's one-third interest is $18,988.23.

Junior has no liability to the plaintiff with respect to any of the foregoing three categories of assets based on breach of a fiduciary duty he owed to Senior during Senior's lifetime because the only claims for damages are damages that accrued with respect to Senior's estate.

Also, with respect to the claim for breach of fiduciary duties owed by Junior to Senior as his attorney-in-fact, Junior only used the power of attorney in connection with Senior's admissions to Watrous Nursing Center and Strong House Adult Day Center.  Therefore, there is no liability under this theory of the breach of fiduciary duty claim.

As to the claim for breach of fiduciary duty by Junior as a fiduciary to Senior's estate and the beneficiaries thereof, Junior was a fiduciary because he was the executor of Senior's estate.  Therefore, Junior has the burden of proving fair

dealing, and doing so by clear and convincing evidence, clear and satisfactory evidence, or clear, convincing and unequivocal evidence.  He has not done so.  He has not proven fair dealing with respect to the BOA joint checking account, the BOA certificate of deposit accounts, or the F&G Annuity.

Therefore, the plaintiff has proven her claim for breach of fiduciary duty by Junior as a fiduciary to Senior's estate and the beneficiaries thereof with respect to the BOA joint checking account, the BOA certificate of deposit accounts, and the F&G Annuity, and she has proven damages with respect to this count in the amount of $47,107.05 ($366.66 plus $27,752.16 plus $18,988.23).

## C. Tortious Interference with Inheritance (Counts Two and Three)

The appellate courts of Connecticut have not specifically discussed the elements necessary to establish a claim of tortious interference with an inheritance.  However, this cause of action has been recognized by both this court and the Second Circuit as being available in Connecticut.  See, e.g., Devlin v. United States, 352 F.3d 525, 540-42; Caro v. Weintraub, Civil No. 3:09-CV-1353 (PCD), 2010 WL 4514273 (D. Conn. Nov. 2, 2010). But see DiMaria v. Silvester, 89 F. Supp. 2d 195, 196 nn. 2-3 (D. Conn. 1999) (stating without citation or explanation that

Connecticut does not recognize a cause of action for
"intentional interference with an inheritance").

The most common description of the basic elements that must
be proven to establish this tort is in DePasquale v. Hennessy,
No. CV106007472S, 50 Conn. L. Rptr. 605, 2010 WL 3787577 (Conn.
Super. Ct. Aug. 27, 2010): "1) the existence of an expected
inheritance; 2) the defendant's knowledge of the expectancy; 3)
tortious conduct by the defendant, such as fraud or undue
influence; and 4) actual damages to the plaintiff resulting from
the defendant's tortious conduct."  Id. at *3; see also Caro,
2010 WL 4514273, at *10.

In order to satisfy the third element set forth in
DePasquale, the plaintiff must establish either fraud or undue
influence.  Under Connecticut law, "Fraud consists in deception
practiced in order to induce another to part with property or
surrender some legal right, and which accomplishes the end
designed." Billington v. Billington, 595 A.2d 1377, 1379 (Conn.
1991) (quoting T. Cooley, Torts p. 474).  Fraud must be proven
by a standard higher than the usual fair preponderance of the
evidence, which higher standard the Connecticut Supreme Court
has described as clear and satisfactory or clear, precise and
unequivocal.  See Weisman v. Kaspar, 661 A.2d 530, 540 (Conn.
1995).

Undue influence, on the other hand, may be shown by establishing the following four elements: "(1) a person who is subject to influence; (2) an opportunity to exert undue influence; (3) a disposition to exert undue influence; and (4) a result indicating undue influence." <u>Pickman v. Pickman</u>, 505 A.2d 4, 7 (Conn. App. 1986).  When evaluating whether a defendant has exerted undue influence over a third party

> [r]elevant factors include "age and physical and mental condition of the one alleged to have been influenced, whether he had independent or disinterested advice in the transaction . . . consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his predisposition to make the transfer in question, the extent of the transfer in relation to his whole worth . . . failure to provide for all of his children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties."

<u>Id.</u> (quoting 25 Am. Jur. 397-98, Duress and Undue Influence § 36).  Additionally, "[b]ecause direct evidence of intent is difficult to obtain, undue influence may be proved circumstantially." <u>Reynolds v. Molitor</u>, 440 A.2d 192, 194 (Conn. 1981).  Like fraud, the burden of establishing undue influence is on the party who asserts it.  <u>See Pickman</u>, 505 A.2d at 7.

Here, while the plaintiff has proven that Junior wrongfully kept the funds in the BOA checking account, the funds in the BOA certificate of deposit accounts, and the proceeds of the F&G

Annuity, and she has proven that she did not receive any money on account of the shares of stock owned by Senior, she has not met her burden of proving fraud or undue influence.  With respect to fraud, she has not proven that there was any deception practiced by Junior or PBR in order to induce another to part with property or surrender some legal right.  Compare Caro v. Weintraub, No. 3:09-CV-1353 PCD, 2010 WL 4514273, at *10 (D. Conn. Nov. 2, 2010) ("[T]he Weintraub brothers played fabricated audio files for the Probate Court . . . ."). Also, there is no evidence that Junior or PBR attempted to influence Senior with respect to a revision of Senior's Last Will and Testament, which was executed on March 6, 1999, or any other document pursuant to which the assets in his estate would be distributed.  Compare DePasquale v. Hennessey, No. CV106007472S, 2010 WL 3787577, at *2 (Conn. Super. Ct. Aug. 27, 2010) ("A fair reading of the allegations set forth in support of count one [is that they] are clearly addressed to actions of the defendants in exercising undue influence over the decedent, as those actions relate to her last will and testament, a third amendment to a trust and several other inter vivos actions and transfers.").  Rather, the claim here is that Junior did not include in Senior's estate assets that were a part of the estate.

D.    **Unjust Enrichment (Counts Four and Five)**

Unjust enrichment is essentially an equitable remedy that "applies whenever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract." Vertex, Inc. v. City of Waterbury, 898 A.2d 178, 190 (Conn. 2006).  However, "a contractual relationship is [not] a prerequisite to recovery based on unjust enrichment." Schirmer v. Souza, 12 A.3d 1048, 1052 (Conn. App. 2011).  When there is no contractual relationship between the parties,

> Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. . . . "This doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated. . . .The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?

Id. at 1052.

In addition to these three elements listed above, the plaintiff bears the burden of establishing the amount of damages.  "[T]he measure of damages in an unjust enrichment case ordinarily is not the loss to the plaintiff but the benefit to

the defendant." <u>Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.</u>, 649 A.2d 518, 522 (Conn. 1994).

The court's analysis with respect to the Commercial Promissory Note and the coin collection is the same as with respect to the claim for breach of fiduciary duty.  With respect to the shares of New Oro Peru Resources and McMoRan Exploration stock owned by Senior the plaintiff has not proven that Junior benefitted as a result of the stock.

With respect to Junior, the plaintiff has proven by a preponderance of the evidence with respect to the BOA checking account, BOA certificate of deposit accounts, and the F&G Annuity that Junior received Jane's share of the asset in question, that he did not pay her for that benefit, and his failure to pay her for that benefit was to her detriment. Therefore, Jane's damages with respect to Count Four are the same as her damages with respect to Count One.

With respect to PBR, the plaintiff has not proven that PBR received any benefit with respect to any of the BOA checking account, BOA certificate of deposit accounts, and the F&G Annuity.

**E.   Unlawful Conversion (Count Six)**

Under Connecticut law, a plaintiff must prove four elements to establish a claim for unlawful conversion: "(1) the material at issue belong[s] to the plaintiff, (2) that [the defendant]

deprived the plaintiff of that material for an indefinite period of time, (3) that [the defendant's] conduct was unauthorized and (4) that [the defendant's] conduct harmed the plaintiff." <u>News America Marketing In-Store, Inc. v. Marquis</u>, 862 A.2d 837, 848 (Conn. App. 2004), <u>aff'd</u>, 885 A.2d 758 (2005). "The measure of damages in conversion . . . is--'in general, the value of the property at the time of conversion, with interest.'" <u>Healey v. Flammia</u> 113 A. 449, 450 (Conn. 1921) (quoting <u>Seymour v. Ives</u>, 46 Conn. 109, 113 (1878)).

The first element of this prima facie case--that the plaintiff was the owner of the allegedly converted property--is particularly important with respect to claims based on inheritance. While under Connecticut law it is "well-established that an action in conversion may lie in favor of a will beneficiary against the fiduciary of an estate", such an action is only available after "the plaintiff's expectancy of an inheritance [has] ripened into a vested property right . . . ." <u>Moore v. Brower</u>, No. X10UWYCV054010227S (CLD), 41 Conn. L. Rptr. 681, 2006 WL 2130385, at *3 (Conn. Super. Ct. June 14, 2006). For purposes of the ripening of the plaintiff's vested right, "[t]he moment of the decedent's death determines the right of inheritance or testamentary succession." <u>Krause v. Krause</u>, 387 A.2d 548, 550 (Conn. 1978).

The court's analysis with respect to the Commercial Promissory Note and the coin collection is the same with respect to this claim as with respect to the claim for breach of fiduciary duty.  Also, with respect to the shares of McMoRan Exploration and New Oro Peru Resources stock owned by Senior, the plaintiff has not proven that Junior converted the stock.

However, the plaintiff has established that she had a vested property right in her share of Senior's estate, that Junior deprived her of funds that were due her as a beneficiary of the estate with respect to the BOA checking account, the BOA certificate of deposit accounts and the F&G Annuity, and that Junior's conduct was unauthorized and harmed her.  Therefore, the plaintiff has proven that she is entitled to recover for unlawful conversion and her damages with respect to Count Six are the same as her damages with respect to Counts One and Four.

**F.   Statutory Theft (Count Seven)**

A claim for statutory theft is governed by Conn. Gen. Stat. §52-564, which states: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."  The Connecticut Supreme Court has recognized that

> [s]tatutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119 . . . . Pursuant to § 53a-119, [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he

wrongfully takes, obtains or [withholds] such property
from an owner . . . .

Deming v. Nationwide Mut. Ins. Co., 905 A.2d 623, 639 (Conn.
2006) (quoting Howard v. MacDonald, 851 A.2d 1142, 1152 n.8
(Conn. 2004)) (alterations in original).  Although conversion
and statutory theft may seem similar, "[c]onversion can be
distinguished from statutory theft . . . in two ways. First,
statutory theft requires an intent to deprive another of his
property; second, conversion requires the owner to be harmed by
a defendant's conduct."  Howard, 851 A.2d at 1152 n.8.
Therefore, in order to demonstrate statutory theft, the
plaintiff must establish all of the elements of conversion
stated above (except harm to the plaintiff), as well as show
intent on the part of the defendant.  Such "'[i]ntent may be
inferred by the [trier of fact] from the conduct of the
defendant.'"  Masse v. Perez, 58 A.3d 273, 279 (Conn. App. 2012)
(quoting State v. Kimber, 709 A.2d 570, 574 (Conn. App. 1998)
(discussing intent in the context of larceny)) (alterations in
original).  The plaintiff need only establish statutory theft by
a preponderance of the evidence.  See Stuart v. Stuart 996 A.2d
259 (Conn. 2010).

     The plaintiff has failed to prove that Junior had the
requisite intent, namely, an intent to deprive her of certain
property.  The plaintiff has certainly demonstrated that Junior

deprived her of her property.  However, with respect to the BOA
checking account and the BOA certificate of deposit accounts, it
is at least as likely as not that Junior <u>believed</u> that Senior
had converted all of Senior's bank accounts to joint
survivorship accounts.  Junior signed an affidavit to this
effect before this lawsuit was initiated and he testified that
he still believes so.  The fact that the court has found
otherwise based on the Form S-2 succession tax return does not
mean that Junior is in agreement.  As the F&G Annuity was the
proceeds of a BOA account, the same analysis applies to it.
Consequently, the court concludes that it is as likely as not
that Junior's intent was simply to retain property that he
thought was his own as opposed to depriving the plaintiff of her
property.

**IV.  CONCLUSION**

Accordingly, judgment shall enter in favor of plaintiff
Jane Pascale Kite against defendant John Pascale, Jr. in the
total amount of $47,107.05 on Count One (breach of fiduciary
duty as executor of an estate), Count Four (unjust enrichment)
and Count Six (conversion)].  Judgment shall enter in favor of
defendant John Pascale, Jr. on Count Two (tortious interference
with the plaintiff's inheritance) and Count Seven (statutory
theft), and in favor of defendant Pascale-Burger Rentals Inc. on

Count Three (tortious interference with the plaintiff's inheritance) and Count Five (unjust enrichment).

The Clerk shall close this case.

It is so ordered.

Dated this 31st day of March 2015, at Hartford, Connecticut.

 

 

 

                                      _____/s/_____
                                                 Alvin W. Thompson
                         United States District Judge